**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JOHNATHAN JOHNSON,

                                              Plaintiff,

          v.                                                                          No. 07-CV-1018
                                                                                      (DNH/DRH)

ROBERT WOODS, Superintendent, Upstate
Correctional Facility; S. THOMPSON, Sergeant,
Upstate Correctional Facility; D. UHLER, Captain,
Upstate Correctional Facility; J. DURGAN, Lieutenant,
Upstate Correctional Facility; JEROME SNYDER,
Captain, Upstate Correctional Facility; QUINN,
Captain, Upstate Correctional Facility; T. RAMSDELL,
Prison Guard, Upstate Correctional Facility; CANDY
ATKINSON, Nurse, Upstate Correctional Facility;
PATRICK JOHNSON, P.A., Upstate Correctional
Facility; B. CONNOLLY, Doctor, Upstate Correctional
Facility; S. SANTAMORE, Prison Guard, Upstate
Correctional Facility; N. SMITH, Administrative Nurse,
Upstate Correctional Facility; KAREN BELLAMY,
Director, Inmate Grievance Program; L. PEARY,
Supervisor of Inmate Grievance Program, Upstate
Correctional Facility; J. SORRELL, Prison Guard,
Upstate Correctional Facility; T. DEBYAH, Prison
Guard, Upstate Correctional Facility; J. WHITE, Prison
Guard, Upstate Correctional Facility; K. BUCKLEY,
Lieutenant, Upstate Correctional Facility; J. BISHOP,
Prison Guard, Upstate Correctional Facility; L.
MARLOW, Nurse, Upstate Correctional Facility; and N.
LaVIGINE,

                                              Defendants.

_____

**APPEARANCES:**                                    **OF COUNSEL:**

JOHNATHAN JOHNSON
Plaintiff Pro Se
89-A-1042
Upstate Correctional Facility
Post Office Box 2001
Malone, New York 12953

HON. ANDREW M. CUOMO                          ROGER W. KINSEY, ESQ.
Attorney General for the                      Assistant Attorney General

State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Johnathan Johnson ("Johnson"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, twenty-one DOCS employees at Upstate Correctional Facility ("Upstate"), violated his constitutional rights under the First and Eighth Amendments.  Compl. Dkt. No. 1.  Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 70.  Johnson opposes the motion.  Dkt. No. 72.  For the following reasons, it is recommended that defendants' motion be granted.

### I. Background[2]

The facts are related herein in the light most favorable to Johnson as the non-moving party.  See subsection II(A) infra.  All events occurred during Johnson's incarceration at Upstate.  See generally Compl.

---

[1]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] Johnson has correctly indicated that declarations must be made by those with personal knowledge of the events in question.  Johnson Aff. (Dkt. No. 72) ¶¶ 60, 76. Thus, while some portions of defendants' declarations are hearsay, the citations to affidavits herein are only to those for which the affiant was personally involved or otherwise had personal knowledge.

**A. Cell Extraction**[3]

On May 10, 2007, defendants Thompson and Uhler were making rounds on the gallery when they approached Johnson's cell. Thompson Decl. (Dkt. No. 70-18) ¶ 5; Uhler Decl. (Dkt. No. 70-19) ¶ 5;  Dkt. No. 70-7 at 6.[4] Thompson and Uhler contend that Johnson had his cell window covered with paper, in contravention of Special Housing Unit ("SHU")[5] policy. Thompson Decl. ¶ 6; Uhler Decl. ¶ 6; Dkt. No. 70-7 at 6; Dkt. No. 70-12 at 13. Thompson ordered Johnson to remove the paper to which Thompson contends, Johnson did not comply. Thompson Decl. ¶ 7; Uhler Decl. ¶ 7; Dkt. No. 70-7 at 6; Dkt. No. 70-12 at 16[6]. Thompson then ordered correctional staff to remove Johnson from his cell and Uhler

---

[3] Defendants have provided three video tapes which capture the events of May 10, 2007. See Videos 1-3. The first two, both from fixed camera locations, run, from noon to 1:00 p.m. and from 2:00 p.m. to 3:00 p.m. The third, from a handheld camera operated by defendant Sorrell, recorded during the extraction, decontamination, and medical examination. Video evidence, in conjunction with other papers, have been used as a basis to grant summary judgment in an excessive force claim. See e.g., Stanley v. Hejirika, 134 F.3d 629, 635-36 (4th Cir. 1998) (finding videotape evidence in excessive force claim sufficient to defeat claim against officers who "used significant physical force in subduing [plaintiff], but they also had objectively reasonable grounds to believe such force was necessary.").

[4] This document is a report written by Thompson and attached as an exhibit to many of the defendants' declarations. See also Dkt. Nos. 70-10 at 6-8; 70-14 at 6-8; 70-19 at 34-36; 70-20 at 6-8. Accordingly, for the sake of brevity, citation will only be made once to the first copy which was included in defendants' motion.

[5] SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ." N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

[6] This document is the "Unusual Incident Report" from May 10, 2007, which is attached as an exhibit for many of defendants' declarations. See also Dkt. No. 70-19 at 41-55; Dkt. No. 72-3 at 42-45. For the sake of brevity, citation will only be made once, to the first copy which was included in defendants' motion.

ordered that all Johnson's paper be confiscated, with the exception of his toilet paper, and

that Johnson be placed on paper deprivation.  Dkt. No. 70-7 at 6; Dkt. No. 70-12 at 13, 15.

Johnson asserts that he never had paper on his cell window and that defendants created

this pretext to confiscate his legal materials regarding pending litigation against defendants.

Johnson Dep. (Dkt. No. 70-3) at 14-15, 19, 20-21; Johnson Mem. of Law (Dkt. No. 72-1) at

24.  Johnson also attributes his persistent, vulgar name calling of defendants constituted a

reason for their retaliatory behavior and contentious relationship.  Johnson Dep. at 26-27,

32-33 (explaining that every time Johnson saw corrections staff, he called them vulgar

names and shouted expletives because he did not like any of them).  Video of the event

shows that the two corrections officers stopped at Johnson's cell and had a conversation

with him, though the vantage point does not show whether there was paper on his cell

window.  Video 1.

   Johnson was ordered to place his hands through the slot in the cell door so that

restraints could be applied.  Dkt. No. 70-7 at 6.  Johnson refused to put down a pen he was

holding and comply, threatened to stab defendant Ellsworth, and spat on the cell door

window.  Id.  Johnson "has an extensive disciplinary history . . . [and] is a persistent spitter,

thrower of sewer water, assaultive, harassing and defiant."  Buckley Decl. (Dkt. No. 70-8) ¶¶

3-4; Thompson Decl. ¶¶ 3-4; Uhler Decl. ¶¶ 3-4; Woods Decl. (Dkt. No. 70-21) ¶¶ 4-5;

see also Dkt. No. 70-13 at 21-27 (Inmate Disciplinary History at Upstate).  Defendant

Buckley spoke to Johnson and Johnson agreed to comply with the staff's orders.  Buckley

Decl. ¶ 11; Thompson Decl. ¶ 11; Uhler Decl. ¶ 11; Dkt. No. 70-7 at 6.  When Ellsworth

opened the cell door slot to apply restraints on Johnson's wrists, Johnson pulled a pen from

his waistband, attempted to stab Ellsworth, and spat out the slot.  Buckley Decl.  ¶¶ 12-13;

4

Thompson Decl. ¶¶ 12-13; Uhler Decl. ¶¶ 12-13; Dkt. No. 70-7 at 6; Dkt. No. 70-12 at 13,

15, 16; Johnson Dep. at 34-36.  Johnson testified that he did not have a pen in his hand

during these conversations but acknowledges attempting to stab Ellsworth with a pen when

he reached through the slot.  Johnson Dep. at 24, 34-36.  Johnson also testified that he

kicked the pen out of his cell at a later point in an attempt to show compliance but that

Thompson kicked the pen back into the cell.  Johnson Dep. at 49.

   "A stand-off ensued with [Johnson] refusing to comply with multiple orders to exit the

cell."  Buckley Decl. ¶ 14; Thompson Decl. ¶ 14; Videos 2, 3.  Johnson disputes this fact,

alleging that he was willing to exit his cell voluntarily but was prohibited from doing so.

Johnson Dep. at 20, 23-24, 44-45.[7]  However, Johnson also testified that he intended to exit

his cell fighting and that defendants were fully aware of his combative intentions.  Id. at 36-

37, 41-45, 54-55.  The Crisis Intervention Unit, Johnson's guidance counselor, and a

chaplain were all summoned to attempt to assist in achieving Johnson's cooperation.

Buckley Decl. ¶ 15; Thompson Decl. ¶ 15; Uhler Decl. ¶ 15; Dkt. No. 70-7 at 6; Dkt. No. 70-

12 at 16.  None were successful.  Buckley Decl. ¶ 16; Thompson Decl. ¶ 16; Uhler Decl. ¶

16; Dkt. No. 70-7 at 6; Dkt. No. 70-12 at 16.

   Defendant Woods, the Upstate Superintendent, then authorized the use of chemical

agents to subdue Johnson.  Buckley Decl. ¶ 17; Thompson Decl. ¶ 17; Uhler Decl. ¶ 17;

Woods Decl. ¶¶ 18, 20; Dkt. No. 70-7 at 6.  Concurrently, defendant Atkinson, a member of

the medical staff, confirmed that Johnson was healthy enough to withstand the deployment

---

   [7] Video of the event clearly shows defendants issuing multiple orders for Johnson to
stand at the back of his cell and comply with the officers' demands.  While his responses
are not entirely audible, the video also captures Johnson's yelling and screaming back at
the officers.  See Video Exs. 1-3.

of the agents. Buckley Decl. ¶ 18; Thompson Decl. ¶ 18; Uhler Decl. ¶ 18; Dkt. No. 70-7 at 6. Defendants Ramsdell, Bishop, White, and Debyah, the extraction team, assembled. Bishop Decl. (Dkt. No. 70-7) ¶ 3; Debyah Decl. (Dkt. No. 70-10) ¶ 3; Ramsdell Decl. (Dkt. No. 70-14) ¶ 3; White Decl. (Dkt. No. 70-20) ¶ 3; Dkt. No. 70-7 at 6. Additionally, defendant Sorrell was called to operate the handheld video camera to document the extraction. Sorrel Decl. (Dkt. No. 70-17) ¶ 3; Dkt. No. 70-12 at 17; Video 3. While the extraction team was positioning itself, two other officers attempted to cover Johnson's cell windows from outside on the roof. Dkt. No. 70-7 at 6. Johnson began throwing liquid out the window, which the defendants stated was urine and Johnson testified was sewer water, to prevent the officers from approaching from the outside. Buckley Decl. ¶ 20; Bishop Decl. ¶ 5; Debyah Decl. ¶ 5; Ramsdell Decl. ¶ 5; Sorrell Decl. ¶ 7; White Decl. ¶ 5; Dkt. No. 70-7 at 6; Johnson Dep. at 52. As the extraction team assembled at the front of the cell, Johnson moved away from the window allowing officers to secure the window from the outside. Dkt. No. 70-7 at 6.

After repeated orders to comply over almost two hours, Buckley gave Johnson a final order to exit the cell, Johnson refused, and five canisters of chemical agents were thrown into Johnson's cell. Buckley Decl. ¶¶ 19, 21; Bishop Decl. ¶¶ 4, 6; Debyah Decl. ¶¶ 4, 6; Ramsdell Decl. ¶¶ 4, 6; Sorrell Decl. ¶¶ 6, 8; Thompson Decl. ¶¶ 19, 21; Uhler Decl. ¶¶ 19, 21; White Decl. ¶¶ 4,6; Dkt. No. 70-7 at 6; Dkt. No. 70-12 at 16; Johnson Dep. at 50; Video 3. Each time the slot was opened to insert a canister of gas, Johnson would throw cups of toilet water out of the cell at the extraction team. Buckley Decl. ¶ 23; Bishop Decl. ¶ 8; Debyah Decl. ¶ 8; Ramsdell Decl. ¶ 8; Sorrell Decl. ¶ 10; Uhler Decl. ¶ 23; White Decl. ¶ 8; Dkt. No. 70-7 at 6; Johnson Dep. at 46-47, 50; Video 3. A plexiglass shield was used to attempt to preclude Johnson from throwing the liquid and to divert it away from the officers.

6

Dkt. No. 70-7 at 6; Video 3.  Johnson also was attempting to block the slot with a towel, but it was pushed aside by Bishop's baton.  Buckley Decl. ¶ 22; Bishop Decl.  ¶ 7; Debyah Decl. ¶ 7; Ramsdell Decl. ¶ 7; Sorrell Decl. ¶ 9; White Decl. ¶ 7; Dkt. No. 70-7 at 6; Video 3.

After the last canister was thrown into Johnson's cell, the extraction team was ordered to enter.  Bishop Decl. ¶ 9; Buckley Decl. ¶ 24; Debyah Decl. ¶ 9; Ramsdell Decl. ¶ 9; Sorrell Decl. ¶ 11; White Decl. ¶ 9; Dkt. No. 70-7 at 7; Dkt. No. 70-12 at 16; Video 3.  Defendant Santamore mechanically opened the cell door.  Santamore Decl. (Dkt. No. 70-15) ¶¶ 3, 11, 13; Dkt. No. 70-7 at 7; Johnson Dep. at 56-57.  Behind the plexiglass shield, Ramsdell was the first to enter the cell.  Bishop Decl. ¶ 10; Buckley Decl. ¶ 25; Debyah Decl. ¶ 10; Ramsdell Decl. ¶ 10; Sorrell Decl. ¶ 12; White Decl. ¶ 10; Dkt. No. 70-7 at 7; Dkt. No. 70-12 at 16.  Johnson claims that he hit the shield with his forearm, knocking Ramsdell off-balance.  Bishop Decl. ¶ 10; Debyah Decl. ¶ 10; Ramsdell Decl. ¶ 10; Sorrell Decl. ¶ 12; White Decl. ¶ 10; Dkt. No. 70-7 at 7; Johnson Dep. at 57-59.  Johnson attempted to leave the cell but was pulled to the floor by Bishop.  Johnson Dep. at 60.

Bishop entered the cell with a baton.  Bishop Decl. ¶ 14; Debyah Decl. ¶ 14; Ramsdell Decl.  ¶ 14; Sorrell Decl. ¶ 16; White Decl. ¶ 14; Dkt. No. 70-7 at 7.  While the use of the baton is disputed, it was passed back out of the cell shortly after the extraction team entered.  Bishop Decl. ¶ 14; Debyah Decl. ¶ 14; Ramsdell Decl. ¶ 14; Sorrell Decl. ¶ 16; White Decl. ¶ 14; Video 3.  Johnson asserts that the baton was swung at him, though he deflected the blow.  Johnson Dep. at 61-62.  Johnson was then placed on his back and struck on the back of his head with the baton as the rest of the extraction team kicked and beat him while he attempted to hide behind the toilet.  Id. at 62-66; Johnson Aff. (Dkt. No. 72) ¶¶ 23, 29 .  Johnson was unable to see who delivered what blows, but he testified that

7

he remained silent and compliant throughout this attack.  Johnson Dep. at 63-67.  The video footage of the extraction fails to capture what happened in the approximately two minutes defendants were in Johnson's cell, though the audio shows that the entire event was very loud with Johnson yelling at the officers to "get off."  Video 3.

Accordinglt o defendants, Ramsdell gained control over Johnson's left leg until leg irons were applied.  Bishop Decl. ¶ 11; Debyah Decl. ¶ 11; Ramsdell Decl. ¶ 11; Sorrell Decl. ¶ 13; White Decl. ¶ 11; Dkt. No. 70-7 at 7.  Bishop took control of Johnson's right leg, and then applied the leg restraints.  Bishop Decl. ¶ 15; Debyah Decl. ¶ 15; Ramsdell Decl. ¶ 15; White Decl. ¶ 15; Dkt. No. 70-7 at 7; Dkt. No. 70-12 at 16.  White and Debyah took control of Johnson's left and right wrists respectively, and then White applied restraints.  Bishop Decl. ¶¶ 12-13; Debyah Decl. ¶¶ 12-13; Ramsdell Decl. ¶¶ 12-13; White Decl. ¶¶ 12-13; Dkt. No. 70-7 at 7; Dkt. No. 70-12 at 16.  White and Debyah lifted Johnson to his feet and escorted him out of his cell.  Dkt. No. 70-7 at 7.  As Johnson entered the galley to be pat-frisked, he spit on Thompson's right arm.  Bishop Decl. ¶ 18; Debyah Decl. ¶ 18; Ramsdell Decl. ¶ 18; Thompson Decl. ¶ 32; Uhler Decl. ¶ 32; White Decl. ¶ 18; Dkt. No. 70-7 at 7; Dkt. No. 70-12 at 16; Johnson Dep. at 68; Video 3.  Uhler ordered that a spit net be applied.[8]  Bishop Decl.  ¶ 18; Debyah Decl. ¶ 18; Ramsdell Decl. ¶ 18; Thompson Decl. ¶ 32; Uhler Decl. ¶ 32; White Decl. ¶ 18; Dkt. No. 70-7 at 7; Dkt. No. 70-12 at 16; Johnson Dep. at 68-69; Video 3.  After the net was secured, Ramsdell searched Johnson and found a sock tied around his waist.  Bishop Decl. ¶¶ 20-21; Debyah Decl. ¶¶ 20-21; Ramsdell

---

[8] "A 'spit net' is a hooded device with a screen front that when applied to an inmate, limits his ability to see and spit on staff."  Bishop Decl. ¶ 19; Debyah Decl. ¶ 19; Ramsdell Decl. ¶ 19; Sorrell Decl. ¶ 19; Thompson Decl. ¶ 33.

Decl. ¶¶ 20-21; Sorrell Decl. ¶¶ 20-21; Thompson Decl. ¶¶ 34-35; Uhler Decl. ¶¶ 34-35;

White Decl. ¶¶ 20-21; Dkt. No. 70-7 at 7; Video 3.  Within the sock, Ramsdell found

contraband headphones.   Bishop Decl. ¶¶ 20-21; Debyah Decl. ¶¶ 20-21; Ramsdell

Decl. ¶¶ 20-21; Sorrell Decl. ¶¶ 20-21; Thompson Decl. ¶¶ 34-35; Uhler Decl. ¶¶ 34-35;

White Decl. ¶¶ 20-21; Dkt. No. 70-7 at 7; Johnson Dep. at 78; Video 3.

    After the pat-frisk was completed, White and Debyah escorted Johnson to the showers

to wash the chemical agent from his clothes and person.  Bishop Decl. ¶ 22; Debyah Decl.

¶ 22; Ramsdell Decl. ¶ 22; Sorrell Decl. ¶ 22; Thompson Decl. ¶ 36; Uhler Decl. ¶ 36; White

Decl. ¶ 22; Dkt. No. 70-7 at 7; Johnson Dep. 70-71; Video 3.  While in the shower, Johnson

resisted the officers by placing his feet on the walls and pushing away from the water,

claiming that the spit net made it difficult to breathe.  Bishop Decl. ¶ 23; Debyah Decl. ¶ 23;

Ramsdell Decl. ¶ 23; Sorrell Decl. ¶ 23; Thompson Decl. ¶ 37; Uhler Decl. ¶ 37; White

Decl. ¶ 23; Dkt. No. 70-7 at 7; Johnson Dep. at 71; Video 3.  The video of the

decontamination depicts Johnson screaming loudly and persistently throughout the

decontamination process.  Video 3.  White forced Johnson to his knees and he temporarily

ceased resisting.  Bishop Decl. ¶ 24; Debyah Decl. ¶ 24; Ramsdell Decl. ¶ 24; Sorrell Decl.

¶ 24; Thompson Decl. ¶ 38; Uhler Decl. ¶ 38; Dkt. No. 70-7 at 7; Video 3.  Bishop entered

the shower area and relieved White before Bishop and Debyah brought Johnson to a

standing position as Johnson resisted.  Thompson Decl. ¶ 38; Uhler Decl. ¶ 38; Dkt. No. 70-

7 at 7; Video 3.  Johnson was pushed against the wall to complete the decontamination

process.  Thompson Decl. ¶ 38; Uhler Decl. ¶ 38; Dkt. No. 70-7 at 7; Video 3.  Johnson's

jumpsuit was removed and discarded.  Dkt. No. 70-7 at 7; Dkt. No. 70-12 at 15; Video 3.

    Johnson was then moved to a holding pen, where he was examined by defendant

Marlow, a nurse.  Dkt. No. 70-7 at 7; Video 3.  Johnson complained that his head hurt,[9] but that could not be examined due to the spit net.  Marlow Decl. ¶¶ 8-9, Johnson Dep. at 72; Video 3.  Otherwise, no injuries were reported or observed.   Bishop Decl. ¶ 25; Debyah Decl. ¶ 25; Ramsdell Decl. ¶ 25; Sorrell Decl. ¶ 25; Thompson Decl. ¶ 39; Uhler Decl. ¶ 39; White Decl. ¶ 25; Dkt. No. 70-7 at 7; Dkt. No. 70-12 at 16.  Photographs were taken by non-party officer Dishaw.  Dkt. No. 70-7 at 7; Video 3.

After Johnson's room was decontaminated, he was returned to his cell.  Dkt. No. 70-7 at 7.  Corrections officers removed all of Johnson's papers, as well as five cups which were used to store and propel liquid at the staff and two pens.  Dkt. No. 70-7 at 7-8.  Johnson contends that he only had one cup and one pen in his cell, in accordance with facility policies.  Johnson Dep. at 77-78.  Upon arrival, Johnson was ordered to kneel in his cell, whereupon the spit net was removed, the door was closed, and the mechanical restraints were removed.  Dkt. No. 70-7 at 7; Dkt. No. 70-12 at 16; Video 3.


### B. Medical Treatment[10]

Prior to the cell extraction on May 10, 2007, Johnson was evaluated by medical staff because, as a disciplinary sanction, he was placed on a loaf diet.  Atkinson Decl. ¶¶ 5-6.

---

[9] Johnson contends that when he was hit in the head once with the baton, the blow did not break the skin, but left a bump on his head.  Johnson Dep. at 64.

[10] Defendants' filed Johnson's medical records and defendant medical staff declarations traditionally.  A copy of the filings were also provided to Johnson.  Thus, citations to the medical record will be made to the pagination provided in defendants' traditional filing.  Additionally, while Johnson included portions of his medical records as exhibits, for the sake of convenience citations will only be made to defendants' submissions as they represent the complete record.

When Atkinson arrived that morning to examine Johnson, he yelled at Atkinson, was vulgar and obscene, and threatened to sue her.  Atkinson Decl. ¶¶ 8-9; Atkinson Decl., Ex. A (health records noting Johnson's discontent with the loaf diet, general alertness, and vulgar and argumentative behavior).  Later in the afternoon, Atkinson was contacted and approved the use of chemical agents on Johnson.  Atkinson Decl. ¶ 11; Atkinson Decl., Ex. B.  The gas failed to affect Johnson dramatically or make him ill, and only made his eyes water.  Johnson Dep. at 53; Video 3 (Johnson stating the his eyes burned from the gas).

Following the extraction,[11] defendant Marlow attempted to examine Johnson in the holding pen.  Marlow Decl. ¶7.  Johnson reported a bump on his head,[12] but with the spit net on, Marlow was unable to see Johnson's head and face.  Marlow Decl. ¶¶ 8-9; Johnson Dep. at 72.  Johnson laughed at defendants' efforts because "they didn't do nothing [sic] to [him] but break [his] hand and bruise [him] up a little bit."  Johnson Dep. at 70.  Marlow noted no injuries, bleeding, bruises, or scratches.  Atkinson Decl., Ex. B.  Later that evening, when Johnson was back in his cell and not wearing the spit net, Marlow again attempted to examine him.  Marlow Decl. ¶ 10; Atkinson Decl., Ex. B.  Johnson became argumentative and the examination was terminated with no subjective reports or objective findings of an injury.[13]  Marlow Decl. ¶ 11; Atkinson Decl., Ex. B.  Johnson asserts that

---

[11] Pursuant to DOCS policies and procedures, when force is used on an inmate, he or she must be examined by medical staff.  Marlow Decl. ¶ 6.

[12] See note 9 supra.

[13] Johnson's confrontations with prison employees are frequently documented.  Medical staff indicate, without denial, that Johnson "subjected [them] . . . to threats, vulgar language, profanities and a lack of cooperation as we attempted to examine, evaluate, and treat [his] many and varied complaints."  Atkinson Decl. ¶ 27; P. Johnson Decl. ¶ 27; Smith Decl. ¶ 20; see also Johnson Dep. at 86-89.  Health records indicate at least

11

Marlow failed to properly document his injuries, Johnson threatened to sue him because of the failure, and Marlow affirmatively stated that he would note the exact opposite of Johnson's complaints in his medical record that he reported no injuries from the use of force.  Johnson Dep. at 73-74; Johnson Aff. ¶ 74.

The following morning, Atkinson again checked on Johnson.  Atkinson Decl. ¶ 13.  Johnson "complained that he had hurt his knuckle when he hit the white cracker."  Atkinson Decl. ¶ 13; Atkinson Decl., Ex. C (medical notes stating that Johnson's knuckle hurt from hitting another officer and that he was laughing when he informed the medical department of his injury); Marlow Decl. ¶ 12; Johnson Dep. at 106.  Atkinson immediately referred Johnson to the physician's assistant, defendant P. Johnson.  Atkinson Decl. ¶ 23; Johnson Dep. at 74.  That same day, P. Johnson sent Johnson to the infirmary for x-rays and treatment of his finger.  Atkinson Decl. ¶ 15; P. Johnson Decl. ¶¶ 12, 22-23; Johnson Dep. at 74-75.

Infirmary records indicate that Johnson was complaining of pain in his right rib area and left pinky finger, his finger was swollen, and that the x-rays of his hand showed an "impacted spiral fracture" of his finger.  Atkinson Decl., Ex. D; see also Atkinson Decl., Exs. E, F (Radiology results showing a fracture of the left pinky finger and unremarkable films of the rest of the hand and his face and eyes).  Johnson contends that medical staff failed to investigate his additional complaints of rib and head pain.  Johnson Dep. at 75.  However,

---

fourteen instances where Johnson's temper, derogatory remarks, and threats were documented from September through December, 2007.  Atkinson Decl., Exs. Z, AA-DD.  Johnson acknowledges calling all staff derogatory names (Johnson Dep. at 86-88, 89) and suing staff for failing to treat him even after examinations were terminated for his vulgar and abrasive treatment of the medical staff.  Johnson Dep. at 86.

while at the infirmary, Johnson's orbital area, his face and eyes, were x-rayed as well as his hand.  Atkinson Decl., Exs. E, F.  The finger was splinted, Johnson was instructed to keep the splint clean, dry, intact, and elevated, and Johnson was provided with Motrin for pain relief.  Atkinson Decl., Ex. D.

On May 12, 2007, Johnson was examined for complaints of congestion and sore ribs, although he exhibited no signs of distress or complained of the treatment for his  hand.  Atkinson Decl. ¶ 16.  Medical notes indicate that Johnson was yelling and laughing during the appointment, and that, upon examination, his splint was intact, he could wiggle his fingers on his left hand, there was no appreciable swelling, and there was good circulation as his nail beds remained pink.  Atkinson Decl., Exs. C, G.  Records from the following day also indicate that his fingers and splint were checked, his gait was steady, and his speech was clear.  Atkinson Decl., Ex. G.  On May 15, 2007, Johnson's left hand and right ribs were x-rayed and no abnormalities were found. Id. ¶ 17.  The radiology reports were unremarkable for his ribs, showing no evidence of fracture . . . ."  Id., Exs. C(1), K.  On May 17, 2007, Johnson's splint was again checked, circulation was still good, there was no swelling noted, and he could easily wiggle his fingers.  Id., Ex. M.

On May 18, 2007, Johnson was scheduled for transport to Alice Hyde Medical Center to meet with Dr. Marco, an orthopaedist.  Atkinson Decl. ¶ 18 & Exs. C(1), H.  Johnson was "extremely uncooperative" throughout the day, but was still called out for his appointment.  Id. ¶ 19.  While waiting in the holding pen, prior to departure, Johnson was ordered to sit down to wait, yet refused to comply with the orders, becoming argumentative and aggressive.  Johnson Dep. at 91-92; Dkt. No. 72-4 at 2 (misbehavior report issued for Johnson because he refused to comply with orders to be seated and then verbally harassed

corrections staff)[14].  After leaving SHU, Johnson refused to receive treatment from Dr.

Marco.  Atkinson Decl. ¶ 20.  Johnson refused treatment because his escort guards,

particularly defendant LaVigine, threatened to assault him upon their arrival to a holding cell

in another correctional facility.  Johnson Dep. at 90-91; Johnson Aff. ¶ 70.  Dr. Marco still

provided an assessment, noting that Johnson had refused treatment, but, if he

reconsidered, "to have a cast and treatment," Johnson could contact his staff.  Atkinson

Decl., Ex. H.  Dr. Marco also recommended that Johnson continue the splint for at least six

weeks, especially if he chose not to reschedule his appointment.  Id. Ex. H.

On May 30, 2007, Johnson filed a grievance against the escorting officers for

threatening him and precluding him from attending his specialist appointment.  Dkt. No. 72-

3 at 57.  On June 6, 2007,, the grievance was denied, citing Johnson's actions as

constituting the reason why he was given a misbehavior report and refused to attend the

appointment and finding no merit to his allegations of staff harassment.  Id. at 58.  Almost

immediately after the denial, on or about June 7, 2007, Johnson sought to make another

appointment with the specialist and signed a consent form with Atkinson for another trip to

the orthopaedist.  Johnson Dep. at 93-94; Johnson Aff. ¶ 72; Dkt. No. 72-4 at 8.  However,

the form was never submitted and Johnson's appointment was never rescheduled.

Johnson Mem. of Law (Dkt. No. 72-1) at 8.  On July 18, 2007, almost a month after signing

the consent form, Johnson learned that no new referral had been placed in the CORC

affirmation of his previously denied grievance.  Skt. No. 72-3 at 59.

Throughout the Fall, Johnson frequently refused examinations pertaining to the care of

---

[14] Johnson was found guilty on this charge, but the finding was reversed on administrative appeal.  Dkt. No. 72-4 at 3-6.

his hand and removal of his splint."  Atkinson Decl.  ¶ 24; Marlow Decl. ¶ 22; Smith Decl. ¶

17; see also Atkinson Decl. ¶¶ 25 (refusal to have hand x-rayed on August 9th), 26 (noting

general refusal of medical treatment on three days in September and three days in

October), & Exs. R (refusal on September 30th to have hand and wrist examined), V, W

(same refusal from October 4), Y (same refusal from October 9), Z (same refusal from

October 10), BB (same refusal from October 11), CC (same refusal from October 13).

Johnson disputes these allegations, testifying that he never refused any treatment or failed

to attend examinations at his cell.  Johnson Dep. at 84-85.

    It appears that Johnson's splint was removed in October.  Atkinson Decl., Ex. S.

Radiology reports from October 11 and December 24, 2007 both indicated normal results

with no new abnormalities and no change in the position of his slightly displaced, healed,

left pinky fracture.  Atkinson Decl.  ¶¶ 28, 30 & Exs. FF, GG; Smith Decl. ¶¶ 21, 25.  Thus,

Johnson did not have any hand condition requiring further treatment.  Atkinson Decl. ¶ 32.

## C. Grievances

On May 14, 2007, Johnson filed an inmate[15] grievance contending that his legal documents had been removed illegally from his cell.  Quinn Decl. (Dkt. No. 70-13)[16] ¶ 7; Dkt. Nos. 70-12 at 9-10; 70-13 at 29-31; 72-2 at 33-34.  Quinn was assigned to interview Johnson as a part of the grievance procedure.  Quinn Decl. ¶ 8.  Quinn attempted to interview Johnson on May 24, 2007, but that Johnson "was uncooperative and refused to be interviewed."  Quinn Decl. ¶¶ 9-10; see also Dkt. No.70-12 at 14 (memorandum to Superintendent from Quinn explaining that he unsuccessfully attempted to interview Johnson).[17]  Johnson's grievance was denied on June 12, 2007, citing Quinn's inability to interview Johnson due to his argumentative and uncooperative behavior and the defendants' accounts in the Unusual Incident Report.  Dkt. No. 70-12 at 12.

The following day, Johnson wrote to DOCS Commissioner Fischer, complaining that an investigation had never occurred, Quinn had never attempted to interview him, and the Superintendent's decision was based on faulty information.  Dkt. Nos. 70-6 at 3; 72-3 at 40; Johnson Dep. at 95; Johnson Aff. ¶¶ 37, 40.  Johnson denies the interview ever occurred

---

[15]DOCS has established a procedure for inmates to file grievance about prison conditions and for the resolution of those grievances titled the Inmate Grievance Program (IGP).  "The IGP is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response."  Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

[16] Quinn has submitted two nearly identical declarations.  See First Quinn Decl. (Dkt. No. 70-13); Second Quinn Decl. (Dkt. No. 70-19).

[17] This document is a memorandum from defendant Quinn, identical copies of which are also attached in other defendants' declarations.  See Dkt. No. 70-13 at 33.

because the SHU visitors logs show that Quinn was never on his gallery on May 24 when he allegedly attempted to interview Johnson.  Johnson Aff. ¶¶ 43-46, 48; Dkt. No. 72-3 at 18-30.  On June 19, 2007, Johnson filed another grievance, complaining that Quinn had never interviewed him.  Dkt. No. 72-2 at 35.  The grievance was ultimately denied, for the same reasons for which Johnson's first grievance concerning the illegal removal of his legal paperwork was demoed.  Id. at 35.  Johnson appealed this denial on July 3, 2007.  Id.  On June 28, 2007, Johnson wrote the DOCS Commissioner another letter, complaining about a delay in the mail services at Upstate.  Dkt. No. 70-6 at 4-5.  On July 26, 2007, defendant Bellany wrote to Johnson on the Commissioner's behalf, explaining that his Superintendent's Hearing disposition from his first grievance was never appealed and that his other two appeals about his second grievance concerning the failure of Quinn to interview him and the mail delivery system were awaiting further disposition from the CORC.  Dkt. No. 70-6 at 7, see note 15 supra.

On July 31, 2007, Johnson wrote to Bellamy's supervisor, defendant Peary, to seek an extension for his Superintendent's Hearing disposition as he claimed to have mailed the appeal on June 14 and the mail system must have lost, misplaced, or refused to process his appeal.  Dkt. No. 70-12 at 21-22.  On August 2, 2007, Peary denied Johnson's request for an extension citing a lack of mitigating circumstances which would justify such an extension.  Id. at 24.  Specifically, during his incarceration in 2007, Johnson had filed approximately ninety-eight grievances.  Peary Decl. (Dkt. No. 70-12) ¶ 9; see also Dkt. Nos. 70-6 at 9-10; 70-12 at 6-7.  Accordingly, "given [Johnson's] prodigious filing of grievances, the excuse proffered was inconsistent with [Johnson's] experience with the grievance procedure as evidenced by the sheer volume of grievances from [him]."  Peary Decl. ¶ 17.

17

Peary's denial of the requested extension was also a grievable action, which permitted Johnson to file a new grievance about her failure to extend his time limits for submitting his grievance.  Id. ¶ 18; Dkt. No. 70-12 at 24.  It does not appear that any appeal was taken. Johnson contends that Peary not only failed to grant him the extension to which he was entitled but received his appeal and refused to file it.  Johnson Dep. at 97.

## II. Discussion

In his complaint, Johnson alleges that his First Amendment rights were violated when (1) Quinn failed to investigate his grievance and (2) he was not given an extension to file an appeal of the denial of his grievance.  Liberally construing the complaint, Johnson has also alleged that Thompson and Uhler retaliated against him on May 10, 2007 and interfered with his right of access to the courts by illegally seizing his legal paperwork.  Johnson also alleges that his Eighth Amendment rights were violated when (1) he was subjected to excessive force during the cell extraction, (2) defendants failed to intervene and protect him during the cell extraction, and (3) defendants were deliberately indifferent to his broken finger, failing to reschedule a specialty medical appointment.  Lastly, liberally construing the complaint, Johnson alleges a Fourteenth Amendment violation for unconstitutional seizure of his legal documents.  Defendants move for summary judgment on the grounds that (1) Johnson's constitutional claims are meritless; (2) Johnson has failed to establish the personal involvement of Bellamy, Connolly, Woods, Durgan, and Snyder; and (3) defendants are entitled to qualified immunity.

18

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some

19

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477

U.S. at 247-48.


**B. Personal Involvement**

Defendants contend that Johnson has failed to establish that Bellamy, Connolly, Woods,

Durgan, or Snyder was personally involved in any of the alleged constitutional deprivations.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d

Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus,

supervisory officials may not be held liable merely because they held a position of authority.

Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may

be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional
> violation;
>
> (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance of
> such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates
> who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).

### 1. Bellamy

Bellamy was named for both her alleged failure to supervise and her failure to answer Johnson's request for an extension for his grievances.  While Bellamy may not have answered Johnson's request for an extension, a request which she did not appear to realize was addressed to her, Bellamy was still involved in investigating and responding to Johnson's grievances which alleged constitutional violations.  Dkt. No. 70-6 at 7.  This suffices to establish personal involvement.  See e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability. . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

Accordingly, defendants' motion  on this ground as to Bellamy should be denied.

### 2. Woods

In Johnson's opposition papers, he contends that the deployment and use of chemical agents in response to the events of May 16, 2007 were excessive and unconstitutional. Johnson Memorandum of Law at 32-33.  As Woods ordered the use of such agents, he was directly and personally involved in the alleged constitutional violation.  Accordingly, defendants' motion on this ground as to Woods should be denied.

### 3. White, Bishop, Debyah, and Ramsdell

While defendants correctly contend that Johnson has no recollection of who was specifically on the extraction team, each of these defendants' declarations establishes that they were in Johnson's cell when the alleged excessive force was applied and the assault occurred.  Accordingly, defendants have established their own direct and personal involvement in the situation which gives rise to Johnson's alleged Eighth Amendment violation.  Accordingly, defendants' motion on this ground as to these defendants should be denied.

### 4. Connolly, Durgan, Synder

Connolly was a medical doctor at Upstate Correctional Facility, where Johnson was incarcerated.  Connolly Decl. (Dkt. No. 70-9) ¶ 1.  However, Connolly was transferred to Bare Hill Correctional Facility on March 1, 2007, months before the alleged constitutional violations occurred.  Connolly Decl.  ¶ 4.  Accordingly, it is impossible that Connolly was directly involved with the provision, or alleged denial, of Johnson's medical care, as he was not employed at the same institution.

Durgan, a lieutenant working at Upstate, was named as a defendant and part of the extraction team but did not participate in the extraction.  Durgan Decl. (Dkt. No. 70-11)  ¶¶ 1, 3-4.  Durgan is not identified by the other members of the team as a participant and his name does not appear on the relevant reports.  Durgan Id. ¶ 4.  Accordingly, no reasonable person could find that he was directly involved in the constitutional violation.

Similarly, Johnson also claimed that Snyder was involved in the extraction.  Snyder

22

Decl. (Dkt. No. 70-16) ¶ 3.  However, Snyder is a Captain at the Central Command Center, which is located in Albany.  Id. ¶¶ 1, 5.  Snyder was not located at Upstate on May 7, 2007 and has never been assigned to Upstate.  Id. ¶¶ 5-6.  While he received a report of the incident, the facts do not indicate, nor does Johnson allege, that Snyder was personally involved in the extraction.

The record also fails to establish that any of these defendants were in a position responsible for creating or enforcing any of the policies upon which Johnson rests his claims.   Moreover, there are no allegations that any of these defendants were grossly negligent in hiring or supervising subordinates.  Accordingly, defendants' motion on this ground as to Connoly, Durgan, and Snyder should be granted.


### C. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[], privilege[], or immunit[y] secured by the Constitution" or laws of the federal government.  42 U.S.C. § 1983.  Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right.  See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19 (1981).


### 1. Right to an Investigation

Johnson contends that Quinn failed to interview or investigate properly his grievance into the illegal seizure of his legal materials.  Even viewing the facts in the light most favorable to Johnson, he has failed to state a claim upon which relief can be granted because he has no

constitutional right to an investigation.  See Carrasquillo v. City of N.Y., 324 F.Supp.2d 428, 438 (S.D.N.Y. 2004) (holding that prisoners have "no constitutional or federal right to an investigation into . . . [an] accident, or to have his requests for an investigation answered").  Accordingly, defendants' motion as to this claim should be granted.[18]

## 2. Interference with Grievances

Johnson contends that Bellamy, Peary, and Woods all interfered with his ability to file grievances.  Johnson contends that Peary should have granted him an extension by which to file an appeal of a denial of his legal document grievance and that Peary and Bellamy knew of the appeal being lost or delayed but failed to process it on Johnson's behalf.

"Prisoners, including pretrial detainees, have a constitutional right of access to the courts . . . ."  Bourden v. Loughren, 386 F.3d 88, 92 (2d Cir. 2004) (internal quotation marks omitted) (citing Bounds v. Smith, 430 U.S. 817, 821-22 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right to "adequate, effective, and meaningful" access to courts).  "[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim."  Shell v. Brzezniak, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) (citations omitted); see also Cancel v. Goord, No. 00-CV-2042 (LMM), 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("[I]nmate grievance

---

[18] To the extent that such contentions can be construed to allege that Johnson should be compensated for Johnson's failure to comply with DOCS policies and protocols for investigating grievances, such contentions are also meritless.  Bolden v. Alston, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights.  At most, any violation of state procedural requirements would create liability under state law . . . . ").

procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983.") (citations omitted).  However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." <u>Shell</u>, 365 F. Supp. 2d at 370 (citations omitted).

In this case, Johnson cannot establish that he had a liberty interest which required constitutional protection.  However, because the underlying facts of the grievance concerned deprivations under other constitutional amendments and established constitutional grounds, namely allegations of retaliation and excessive force, the substance of Johnson's grievance is addressed <u>infra</u>.  Accordingly, defendants' motion on this ground should be granted.

## D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.

### 1. Medical Care

This prohibition extends to the provision of medical care.  <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take

measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a section 1983 claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

26

In this case, defendants' correctly assert that Johnson has failed to establish a serious medical need.  At best, construing all facts in the light most favorable to Johnson, he suffered a broken pinky finger on his left hand, a slight bump on his head, and a mild head and rib pain.  "[C]onditions that have failed to meet this [sufficiently serious medical needs] standard include . . . a broken finger."  Henderson v. Doe, No. 98-CV-5011, 1999 WL 37833, at *2 (S.D.N.Y. June 10, 1999).  Additionally, mild headaches and tension are insufficient to demonstrate a serious medical need.  Borrelli v. Askey, 582 F. Supp. 512, 513 (E.D. Pa 1984).  Thus, even considering both injuries together, the broken finger and alleged head injury are insufficient to satisfy the objective prong of the analysis.  Furthermore, transient pain is not enough to elevate the injuries into those which a reasonable individual or physician would presume treatment was necessary.

Even if Johnson's injuries constituted a serious medical need, he has failed to allege any delay or deliberate indifference on account of defendants.  It is undisputed that Johnson was mean, vulgar, harassing, and contentious with medical staff.  Atkinson Decl. ¶ 27; P. Johnson Decl. ¶ 27; Smith Decl. ¶ 20; Johnson Dep. at 86-89.  Despite his demeanor, his medical records demonstrate that he was seen and treated, on average, every other day by medical staff.  Such records controvert claims of deliberate indifference.

Furthermore, Johnson was seen immediately after the use of force.  Marlow Decl. ¶¶ 7-9; Johnson Dep. at 72; Video 3.  Even if Johnson's allegations against Marlow are true, Marlow did not prohibit or delay Atkinson from seeing Johnson the following day and referring him to the physician's assistant.  Atkinson Decl. ¶¶ 13, 15, 23; P. Johnson Decl. ¶¶ 12, 22-23; Atkinson Decl., Exs. C-F.  Thus, Johnson received timely care for his injuries.

Johnson was sent immediately to the infirmary, given x-rays for his hand[19] and face, immobilized with a finger splint, and provided with pain medication.  Atkinson Decl., Exs. C-F.  Treatment notes from the following days indicate that Johnson's hand was not swollen, he could wiggle his fingers, and his circulation was good.  Atkinson Decl., Exs. C, G, M.  Despite Johnson's contentions of unbearable pain, such complaints are belied by the medical notes where he was seen alert and never complaining of pain in his wrist, hand, or ribs.  When Johnson did complain of rib pain, he was taken immediately for x-rays which were unremarkable.  Atkinson Decl. ¶ 17; Atkinson Decl., Exs. C(1), K.  Such immediate attention to complaints and diagnostic testing also refutes claims of deliberate indifference.

One of Johnson's primary complaints was the refusal of treatment by a hand specialist.[20]  While the record indicates that Johnson's behavior was the primary cause of his inability to see the hand specialist, even viewing the facts in the light most favorable to Johnson, he has still failed to allege deliberate indifference.  It is undisputed that in June, Johnson and medical personnel began making arrangements for another consultation with a specialist.  Johnson Dep. at 93-94; Johnson Aff. ¶ 72; Dkt. No. 72-4 at 8.  Johnson fails specifically to allege, nor does the record indicate, that any defendant's failure to file the request for a consultation was due to any malicious or wanton disregard for Johnson's health and safety.  See Johnson Mem. of Law at 8 (failing to allege with specificity who, if anyone, from the

---

[19] Radiology records indicate that Johnson's orbital area surrounding his eyes was unremarkable and that there were no fractures.

[20] To the extent that Johnson attempts to allege a constitutional violation based upon LaVigine's alleged threats, such a claim is meritless.  See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed.").

28

medical staff was responsible for not turning in Johnson's request for consultation).  This constituted no more than negligent behavior.  See Estelle , 429 U.S. at 107.  Negligence is insufficient to establish deliberate indifference.  Id. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  This conclusion is corroborated by the medical defendants' further radiology requests for Johnson's hand in October and December (Atkinson Decl. ¶¶ 28, 30; Smith Decl. ¶¶ 21, 25; Atkinson Decl., Exs. EE, GG), which showed unremarkable and unchanged results and indicated that there was no hand condition which required treatment.

    Any contentions by Johnson that he required the care of a specialist, or a cast instead of a splint, are mere disagreements in treatment.  Such disagreements are insufficient to state a claim for deliberate indifference.  Sonds, 151 F. Supp. 2d at 312.  The central inquiry is one of medical appropriateness.  See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986) ("The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves.  The essential test is one of medical necessity and not one simply of desirability.") (internal quotation marks and citations omitted).  Johnson was appropriately immobilized with the splint, which healed his hand as is evidenced by any subsequent radiology reports.  Atkinson Decl. ¶¶ 28, 30; Smith Decl. ¶¶ 21, 25; Atkinson Decl., Exs. EE, GG.  The use of the splint was acknowledged and approved by the orthopaedist, who issued a medical review of Johnson's case despite his inability to examine him personally.  Atkinson Decl., Ex. H.

    Lastly, despite Johnson's contentions to the contrary, any delay in treatment for his hand or removal of his splint after the summer of 2007 was caused by Johnson's own behavior.  The medical record is replete with instances of him refusing treatment and medication in the

fall and winter of 2007.  Atkinson Decl. ¶¶ 24-26; Marlow Decl. ¶ 22; Smith Decl. ¶ 17;

Atkinson Decl., Exs. R, W-Z, BB-CC.  Such subsequent delays had no consequence on

Johnson's healing, as confirmed by the lack of change in his radiology reports, but cannot

be ascribed to claims of deliberate indifference on the defendants' part.  Johnson cannot

refuse treatment and then allege that delays were caused by anyone other than himself.

Accordingly, defendants' motion on this ground should be granted.


### 2. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and

may recover damages for its violation under § 1983.  Hudson v. McMillian, 503 U.S. 1, 9-10

(1992).  The Eighth Amendment's prohibition against cruel and unusual punishment

precludes the "unnecessary and wanton infliction of pain."  Gregg v. Georgia, 428 U.S. 153,

173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).  To bring a claim of excessive

force under the Eighth Amendment, a plaintiff must establish both objective and subjective

elements.  Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and

requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth

Amendment protection."  Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186

F.3d at 262.  However, "the malicious use of force to cause harm constitute[s] [an] Eighth

Amendment violation per se" regardless of the seriousness of the injuries.  Blyden, 186

F.3d at 263 (citing Hudson, 503 U.S. at 9); see also Wilkins v. Gaddy, ___  S. Ct. ___, 2010

WL 596513 (2010) ("The core judicial inquiry . . . was not whether a certain quantum of

injury was sustained, but rather whether force was applied in a good-faith effort to maintain

or restore discipline, or maliciously and sadistically to cause harm."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition <u>de minimis</u> uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Hudson</u>, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" <u>Sims</u>, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." <u>Id.</u> at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" <u>Id.</u> (quoting <u>Hudson</u>, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." <u>Scott v. Coughlin</u>, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

As previously discussed, Johnson has failed to establish an injury of sufficient severity, worthy of Eighth Amendment protection. However, a serious injury is only a factor in the analysis. A <u>de minimus</u> injury may still survive summary judgment if there was a malicious use of excessive force. <u>Blyden</u>, 186 F.3d at 263; <u>see</u> <u>also</u> <u>Wilkins</u>, 2010 WL 596513 (2010) (granting *certiorari* for an Eighth Amendment case which was dismissed based upon the

31

inmate's <u>de</u> <u>minis</u> injury without discussion or regard for the fact that "injury suffered . . . is one factor . . . [yet] it is [force] that ultimately counts," in determining whether excessive force was used).  Maliciousness is determined by the five factor test enumerated above, in <u>Scott</u>.  Accordingly, after applying such a test in light of the record and videos, no reasonable person could conclude that defendants' actions were malicious or wanton rather than necessary to uphold discipline and ensure safety.

The first factor militates in favor of defendants.  As previously discussed, Johnson did not suffer from sufficiently serious injuries as a result of the extraction.  Moreover, his self-acknowledged violent and combative nature illustrated his unstable mental state.  Johnson Dep. at 36-37, 41-45, 44-45.  The defendants' declarations and video tape all show that, despite Johnson's allegations to the contrary, he was agitated and yelling every time he was approached at his cell.  Videos 1-3.  Moreover, Johnson testified that he intended to fight the corrections staff and taking out as many of the officers as he could, if given the opportunity.  Johnson Dep. at 36-37, 41-45, 44-45.

The second and fourth factors also weigh in favor of defendants.  Defendants attempted multiple times to persuade Johnson verbally to peacefully leave his cell.  Buckley Decl. ¶ 14; Thompson Decl. ¶ 14; Video 3.  They called for assistance upon the CIU, Johnson's counsellor, and the chaplain, all without success.  Buckley Decl. ¶¶ 15-16; Thompson Decl. ¶¶ 15-16; Uhler Decl. ¶¶ 15-16; Dkt. Nos. 70-7 at 6, 70-12 at 16.   When they trusted that Johnson would comply with staff orders, and Ellsworth reached through the slot in the cell door to administer restraints, Johnson attempted to stab him with a pen and spit on him. Buckley Decl. ¶¶ 12-13; Thompson ¶¶ 12-13; Uhler Decl. ¶¶ 12-13; Dkt. Nos. 70-7 at 6, 70-12 at 13, 15-16; Johnson dep. at 34-36.  Johnson's deceit and violence posed a serious

threat to the defendants' health and safety.  Such actions, also corroborated by Johnson's testimony that he intended to fight, and that defendants were fully aware of his intent, leaving no material question of fact that force was the only option for defendants to obtain compliance.  Johnson Dep. at 36-37, 41-45, 54-55.

The third factor, the amount of force used in relation to the need, also supports defendants' motion for summary judgment.  After two hours of attempting to persuade Johnson to comply, defendants resorted to the introduction of gas into the cell.  Buckley Decl. ¶¶ 19, 21; Bishop Decl. ¶¶ 4, 6; Debyah Decl. ¶¶ 4, 6; Ramsdell Decl. ¶¶ 4, 6; Sorrell Decl. ¶¶ 6, 8; Thompson Decl. ¶¶ 19, 21; Uhler Decl. ¶¶ 19, 21; White Decl. ¶¶ 4, 6; Dkt. Nos. 70-7 at 6, 70-12 at 16; Johnson Dep. at 50.  When this was attempted, Johnson remained aggressive and assaultive, trying to block the feed-up slot with a pillow and taking every opportunity to throw various liquids on defendants.  Buckley Decl. ¶¶ 22-23; Bishop Decl. ¶¶ 7-8; Debyah Decl. ¶¶ 7-8; Ramsdell Decl. ¶¶ 7-8; Sorrell Decl. ¶¶ 9-10; White Decl. ¶¶ 7-8; Dkt. Nos. 70-7 at 6; Johnson Dep. at 46-47, 50.  When multiple canisters of gas failed to quell Johnson's increasing rage, the entrance and extraction of him afforded the only other option.  During this extraction, Johnson still failed to cooperate.  As he testified, Johnson hid in his cell, waiting for the extraction team to enter, so that he could attack them and attempt to escape the cell.  Johnson Dep. at 57-59.  Johnson initially hit the defendants by his own admission.  Id.  Moreover, despite Johnson's allegations of a brutal beating, he escaped relatively unscathed and still non-compliant.  This is further shown by Johnson's actions of spitting on Thompson while he is escorted out of the cell.  Bishop Decl. ¶ 18; Debyah Decl. ¶ 18; Ramsdell Decl. ¶ 18; Thompson Decl. ¶ 32; Uhler Decl. ¶ 32; White Decl. ¶ 18; Dkt. Nos. 70-7 at 6, 70-12 at 16; Johnson Dep. at 68-69;

Video 3.  Such actions required the addition of the spit net for the health and safety of the defendants.

Lastly, as previously discussed, the record undeniably shows defendants' attempts to temper and diffuse the situation far before the suggestion of chemical agents and the introduction of an extraction team.  Johnson states multiple times that he was willing to comply and leave his cell, but such contentions are contradicted by the videos and his deposition testimony which indicated that he had, and made known, his intentions to fight every defendant involved in this extraction.  Defendants are charged with running a correctional facility, ensuring the health and safety of both inmate and officers alike. Johnson's deposition testimony, defendants' declarations, and the facility video tapes fail to raise any question of material fact that defendants could have pursued a different option or that their actions were not reasonably calculated to ensure safety.[21]

Accordingly, defendants' motion should be granted on this ground.


### 3. Failure to Intervene

Johnson's "failure to intervene claims premised on his excessive force claim are dismissed [because he] has failed to establish any constitutional violations based on excessive force."  Atkins v. County of Orange, 372 F. Supp. 2d 377, 407 (S.D.N.Y. 2005).

---

[21] For the same reasons articulated infra, Johnson's allegations that the use of chemical agents was excessive force are also denied.  First, the use of chemical agents alone does not represent "malicious or sadistic" actions.  Combs v. Wilkinson, 315 F.3d 548, 557 (6th Cir. 2002) (citations omitted).  Second, the use of such chemicals did not cause any harm or pain to Johnson, as he acknowledged in his testimony.  The gas merely irritated his eyes.  Third, the introduction of gas was appropriate and necessary given Johnson's anger and aggressiveness that had unfolded and increased throughout the hours as defendants attempted to obtain his compliance.

As the Second Circuit has mandated that a "duty to intervene exists only where a person's constitutional rights have been violated," Johnson has failed to establish a basis upon which to state his claim.  Accordingly, defendants' motion should be granted as to this claim.

### E. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached because, as discussed supra, it has not been shown that defendants violated Johnson's constitutional rights.

Therefore, it is recommended in the alternative that defendants' motion on this ground be granted.

## F. Other Claims

### 1. Interference with Access to the Courts

Liberally construing Johnson's complaint, he appears to allege interference with his First Amendment rights based upon defendants' illegal seizure of his legal material from his cell. In order to state a claim of denial of access to the courts a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" Id. (citing Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)).

In this case, even reading the facts in the light most favorable to Johnson, he has failed to allege a viable First Amendment claim.  While Johnson claims that his legal papers were unlawfully stolen, he fails to allege or prove any sort of actual injury which occurred from their confiscation.[22]  Johnson has clearly had no issues with successfully participating in motion practice in the current case.  Thus, without alleging an injury, there is no issue of material fact upon which to base his claims.

Accordingly, defendants' motion as to any such claim should be granted.

---

[22] Johnson has also failed to allege the legal actions to which his stolen papers pertained.  This too is fatal to any such First Amendment claims.  See Lewis v. Casey, 518 U.S. 343, 351 (1996) (holding that the plaintiff must show a "hinder[ance to] his efforts to pursue a legal claim . . . [such as] that a complaint he prepared was dismissed . . . ."); Warburton v. Underwood, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) ("Plaintiff must show that he has suffered an actual injury . . . that is that a nonfrivolous legal claim has been frustrated or was being impeded due to the actions of prison officials.") (citations and internal quotation marks omitted).

## 2. Retaliation

Liberally construing Johnson's complaint, he alleges that defendants Thompson and Uhler fabricated a story to confiscate all of his legal papers in retaliation for Johnson filing of grievances and lawsuits.  To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996); see also Lipton v. County of Orange, 315 F. Supp. 2d 434, 447-48 (S.D.N.Y. 2004) (applying First Amendment retaliation factors to a pretrial detainee complaint).  Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214-15.  Conclusory allegations alone are insufficient.  Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).

In this case, Johnson has failed to allege facts sufficient to support a retaliation claim. While filing grievances and lawsuits are actions protected by the First Amendment, Johnson has failed specifically to alleged who he filed grievances and lawsuits against and when they were filed.  Johnson has failed to allege any facts to establish that Thompson's and Uhler's adverse actions were motivated by, or temporally related to, any constitutionally protected conduct.  Thus, all Johnson has proffered are conclusory allegations to demonstrate that he was the victim of retaliatory conduct.  These conclusory allegations,

37

without more, are insufficient to maintain the present claims.  Id.

　Accordingly, defendants' motion should be granted as to these claims.


### 3. Confiscation of Property

　Liberally reading Johnson's complaint, he may also allege a claim for defendants' theft of his legal papers.  An inmate has a right not to be deprived of property without due process.  However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue.  Hudson v. Palmer, 468 U.S. 517, 533 (1984).  "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims."  See Locurto v. Safir, 264 F.3d 154, 174 (2d Cir. 2001) (citations omitted); see also N.Y. C.P.L.R. §§ 7803, 7804; Campo v. New York City Employees' Ret. Sys., 843 F.2d 96, 101 (2d Cir. 1988) ("Article 78 . . . provides a summary proceeding which can be used to review administrative decisions.").  State law also provides that "[a]ny claim for damages arising out of any act done . . . within the scope of . . . employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state."  N.Y. Corr. Law § 24(2).

　In this case, Johnson contends that there was an unconstitutional deprivation when his legal documents were allegedly confiscated.  Such claims fail as a matter of law for several reasons.  First, the Article 78 procedure exists and affords an adequate state court remedy.  Second, because Johnson is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24.  Thus,

the correct venue to litigate these claims is in state court.  Accordingly, defendants' motion should be granted as to this claim.

## III.  Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 70)  be **GRANTED** and that judgment be granted to all defendant on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  March 2, 2010
      Albany, New York

United States Magistrate Judge